# ORIGINAL

# In the United States Court of Federal Claims

No. 14-67C
(Originally Filed: March 25, 2016)
(Re-filed: April 13, 2016)[1]

**FILED**

**APR 1 3 2016**

U.S. COURT OF
FEDERAL CLAIMS

* * * * * * * * * * * * * * * * * * * * *

KATHLEEN M. KAPLAN,

                        *Plaintiff,*

v.

THE UNITED STATES,

                        *Defendant.*

* * * * * * * * * * * * * * * * * * * * *

Equal Pay Act, 29 U.S.C.
§ 206(d); statute of
limitations; substantially
equal work; willfulness

---

*Kathleen M. Kaplan*, Arlington, VA, pro se.

*Daniel K. Greene*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman Jr.*, Director, and Reginald T. Blades, Jr., Assistant Director, for defendant.

---

## OPINION

---

Plaintiff, Dr. Kathleen M. Kaplan, brings this case against the United States pursuant to the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) (2012), alleging that the Air Force Office of Scientific Research ("AFOSR") willfully violated the EPA. She appears pro se. Pending are the parties' cross-motions for summary judgment. The motions are fully briefed, and oral argument was held on February 2, 2016. For the reasons stated below, we deny both parties' motions for summary judgment.

---

[1] This opinion was originally filed under seal. The parties were directed to propose redactions. The court adopted defendant's suggested redactions, removed the information, and inserted brackets to replace the redacted content. The opinion is now prepared for release.

BACKGROUND[2]

Plaintiff is a United States Air Force civilian employee in the AFOSR Air Force Research Laboratory ("AFLR"). The organizational structure of the AFOSR is complex and further complicated by the fact that the office experienced a reorganization during the time period relevant to this case. The information given to us by the parties provides some insight into the structure of the AFOSR, but it is not comprehensive.

Prior to late 2012 or early 2013, the AFOSR was organized into several different branches. Def.'s App. 170-72. The branch in which plaintiff worked consisted of a series of technical directorates: Physics and Electronics SES ("RSE"); Aerospace Chemical and Material Science ("RSA"); and Mathematics Information and Life Sciences ("RSL"). *Id.* Each directorate had a director, a deputy director, and several program managers. *Id.* Another branch of the AFOSR was the chief scientist's office, which also had several program managers. *Id.* Prior to the reorganization, plaintiff was in the RSE directorate.

In early 2013, the AFOSR went through a reorganization, which eliminated the technical directorates and their deputy director positions. *Id* at 399-405. Five research divisions were created: Dynamical Systems and Control ("RTA"); Quantum and Non-Equilibrium Processes ("RTB"); Information, Decision, and Complex Networks ("RTC"); Complex Materials and Devices ("RTD"); and Energy, Power, and Propulsion ("RTE"). *Id.* Each research division is headed by a chief, under which are a number of program officers. *Id.* After the reorganization, plaintiff was in the RTC division. The AFOSR apparently has since reorganized again, but we have no information regarding the effect of this second reorganization.

The personnel system used by the AFLR is called the Laboratory Personnel Management Demonstration Project ("Lab Demo"). The Lab Demo includes a contribution-based compensation system ("CCS"), which "measures the employee's contribution to the laboratory mission, rather than how well the

---

[2] The facts are drawn from the appendices filed with the parties' cross-motions. The parties are not in agreement as to all of the facts, as we will attempt to point out herein.

employee performed a job." Def.'s App. 64. Within the Lab Demo are four career paths, which determine an employee's pay plan. Plaintiff's career path is the scientist and engineer path ("S&E"). The Lab Demo assigns scientists and engineers into four pay plan categories, called broadbands: DR-I, DR-II, DR-III, and DR-IV. *Id.* at 72. These broadbands replace the government's traditional General Schedule ("GS") structure. DR-I is equivalent to GS-7 through GS-11, DR-II is equivalent to GS-12 and GS-13, DR-III is equivalent to GS-14, and DR-IV is equivalent to GS-15. *Id.* at 76.

S&E positions are also assigned to job categories, which can be one of the following: Supervisor/Manager, Plans and Programs S&E, Program Manager, Support S&E, or Bench Level S&E. *Id.* at 62-63. The AFLR Manual 36-104 describes the general duties assigned to each category. *Id.* The job categories relevant to this case are described in AFLR Manual 36-104 as follows:

| Job Category | Scope of Duties |
|---|---|
| Plans and Programs S&E | "An individual who formulates and recommends plans and policies to enable the effective accomplishment of the organizational mission, and studies mission areas, exploratory technologies, and current developmental and operational programs to plan new efforts or establish new performance goals." |
| Program Manager | "An individual who plans, advocates, coordinates, and evaluates the developmental activities for a system, subsystem, or component to meet cost, schedule, performance and supportability criteria as determined by higher authority; and assures surveillance of critical technical program issues through coordination of a variety of functional discipline and organizational elements. This individual has authority to allocate agency resources to accomplish projects within set milestones." |

| Supervisor/Manager | "An individual who has been delegated authority in the interest of the agency to hire, direct, assign, promote, reward, transfer, furlough, layoff, recall, suspend, discipline, or remove employees, adjust grievance, or effectively recommend such actions, if the exercise is not purely routine or clerical in nature but requires the consistent exercise of independent judgment. Work is accomplished through combined technical and administrative direction of others and constitutes a major duty occupying at least 25 percent of the time. An individual who has full authority to direct the work of an organizational segment; accountability for the success of specific line or staff functions; monitors and evaluates the progress of the organization toward meeting goals; and makes adjustments in objectives, work plans, schedules, and commitment of resources." |
|---|---|

*Id.* at 62-63. In addition to being assigned to a job category, each employee is given a job title. An employee's career path, job category, and job title can be found on the employee's Statement of Duties and Experience ("SDE").[3]

An employee's contributions to the AFLR mission are expressed as a numerical score, called an "overall contribution score" ("OCS"). *Id.* at 364. An employee's OCS ultimately determines his or her salary for the following year. *Id.* at 364. Thus, as an employee's contributions increase, he or she may advance through the broadbands without moving to a new position. *Id.* at 77.

An employee's OCS is determined in accordance with the Lab Demo guidelines and procedures set out in the AFLR Manual 36-104. For DR-IV employees such as plaintiff, an employee's OCS can range from 3.75 to 5.25. *Id.* at 366. Each individual employee's OCS is determined by averaging the score she receives for each of four contribution factors that apply to her particular career path. *Id.* at 67. The scientist and engineer career path is

---

[3] Plaintiff claims that the SDE is an "internal and discretionary" document which is inaccurate, but she has not offered any evidence supporting this argument.

assigned the following contribution factors: problem-solving, communication, technology management, and teamwork and leadership. *Id.* at 72-75.

Each contribution factor is given separate "descriptors," which are used to describe an employee's expected contributions. *Id.* at 364. The descriptors set forth typical contributions for a factor that the AFRL expects from an employee who is in the mid-level of his or her broadband. *Id.* For example, under the problem-solving factor, the complexity element of an employee in the DR-IV broadband provides that the employee "[a]pplies considerable judgment to resolve critical, multifaceted problems spanning multiple disciplines" and "[e]xpertly accomplishes tasks or resolves issues involving significant uncertainties, changes, or competing requirements." *Id.* at 72. The employee's score for a contribution factor is based on a comparison of his or her contributions to the descriptor. *Id.* at 364. Thus, because the descriptors set forth the typical contribution expected from an employee in the mid-level of his or her broadband, an employee whose contribution aligns with these descriptors would receive a mid-level score between 4.4 and 4.6 for that contribution factor.

The annual assessment period during which an employee's OCS is determined begins on October 1 and ends on September 30 of the next year. *Id.* at 66. The process begins with the employee's self-assessment, "which provides an opportunity to state the perceived accomplishments and level of contribution." *Id.* at 65-66. The employee's first-level supervisor then reviews each employee's self-assessment, and uses it, along with the supervisor's own impression of the employee's overall contribution, to create a preliminary assessment of each contribution factor. *Id.* at 67.

Next, the first-level supervisors of the employees being reviewed meet with their second-level supervisors to review and discuss preliminary assessments. *Id.* This is called the Meeting of Managers ("MoM"). *Id.* During the MoM, the assessments are refined into numerical scores, which are averaged to create the employee's OCS. *Id.* After the first MoM, the pay pool manager conducts another MoM to discuss and review preliminary assessments, the purpose of which is to "ensure consistent application of the CCS across the pay pool." *Id.* at 68. During this second MoM, preliminary scores are again reviewed, discussed, and refined. *Id.* at 366.

Once the scores have been finalized, the pay pool manager approves the scores for the entire pay pool. *Id.* The ASOFR provides each of its employees

5

with his or her annual contribution form, the AFRL Form 280. This form contains the employee's salary for the next calendar year, and lists the duties that the employee performed during the assessment period that, in management's view, contributed to the AFLR mission. *Id.* An employee who is not satisfied with his or her assessment may dispute those scores through the ASOFR grievance process. *Id.* at 69.

Upon determination of a employee's OCS, pay adjustments are made. *Id.* at 409. Each career path has a Standard Pay Line ("SPL") which represents a mathematical relationship between the assessed contribution and compensation. *Id.* at 64. This SPL is a straight line, which is placed on a graph that contains basic pay on the vertical axis and contribution scores on the horizontal axis. *Id.* An employee can determine her expected contribution by locating the spot where her salary intersects with the SPL for her career path. *Id.* When pay adjustments are made, whether an employee is given a pay raise is determined by looking at where her contribution falls relative to the SPL for her career path. *Id.* An employee who is within 0.3 contribution units of the SPL is considered equitably compensated. *Id.*

Plaintiff has made claims of unequal pay for two time periods: January 2011 through February 2013, during which time she served as deputy director of the physics and electronics technical directorate of the ASOFR, and February 2013 through the present, during which time she has served as a program officer in the RTC division.

The EPA contemplates a comparison between the claimant and persons she identifies as comparators, i.e., persons who plaintiff believes performed jobs of equal skill, effort, and responsibility but were paid more than plaintiff. We directed plaintiff to provide the court with a list of three male comparators for each position for which she claims she was denied equal pay.

### Claim of Unequal Pay While Deputy Director

From January 2011 through February 2013, plaintiff served as deputy director in the RSE directorate. Her job description and duties are, to an extent, disputed by the parties, and will be discussed in detail below.

Dr. Kaplan identified the following comparators for the position of deputy director: Dr. Milton E. Blackwood, Dr. Hugh C. DeLong, and Dr. John W. Luginsland. Listed below are Dr. Kaplan's and her male deputy director

comparators' contribution scores during the relevant assessment periods, as well as the resulting salary each employee was paid during the year following the relevant assessment period. Def.'s App. 195-214; 232-50; 255-77; 283-303.

|  | OCS 10/2009-9/2010 & 2011 Salary | OCS 10/2010-9/2011 & 2012 Salary | OCS 10/2011-9/2012 & 2013 Salary | OCS 10/2012-9/2013 & 2014 Salary |
|---|---|---|---|---|
| Dr. Kaplan | [ ]<br>[ ] | [ ]<br>[ ] | [ ]<br>[ ] | [ ]<br>[ ] |
| Dr. Blackwood | [ ]<br>[ ] | [ ]<br>[ ] | [ ]<br>[ ] | [ ]<br>[ ] |
| Dr. DeLong[4] | [ ]<br>[ ] | [ ]<br>[ ] | N/A | N/A |
| Dr. Luginsland | [ ]<br>[ ] | [ ]<br>[ ] | [ ]<br>[ ] | [ ]<br>[ ] |

Defendant challenges plaintiff's designation of Dr. Blackwood, Dr. DeLong, and Dr. Luginsland as proper comparators because it believes that Dr. Kaplan and her comparators do not perform "substantially equal" work in terms of skill, effort, and responsibility.

First, defendant points out that Dr. Kaplan and her male comparators for the position were not assigned to the same job category. Dr. Blackwood and Dr. Luginsland were assigned to the "program manager" category, Dr. DeLong was assigned to "supervisor/manager," and plaintiff was assigned to "Plans and Programs S&E." Second, defendant contends that there are no facts demonstrating that any significant portion of the jobs performed by her male comparators were identical to hers. After discussing Dr. Kaplan's job duties, we will address each proposed comparator individually.

---

[4] During the time periods from October 2011 to September 2012 and October 2012 to November 2013, Dr. DeLong became chief of his directorate. Because Dr. Kaplan has not alleged that her duties were similar to his during these time periods, they are not relevant.

A. Dr. Kaplan

Dr. Kaplan's job title (deputy director in the RSE directorate) and duties are reflected in her SDE, which shows that she was responsible for advising the RSE directorate director, assisting with overall strategic planning, budgeting, and policy setting for the directorate, for managing the directorate in the absence of the director, and for performing director duties that the director delegated to her. Her SDE also places her in the "Plans & Programs S&E" job category during the relevant time period. Defendant asserts that Dr. Kaplan did not conduct her own research, perform duties of the director while the director position was vacant, or manage a technical portfolio. The latter two  that she did not perform director duties while the position was vacant or manage a technical portfolio are unsupported; however, regarding Dr. Kaplan's research, defendant points out that one of the abstracts listed on Dr. Kaplan's AFRL Form 280, "Basic Research Challenges in Space Observation" was not authored by her but was actually authored by another AFOSR employee, Dr. Kent Miller. As support, defendant presents a program from the scientific assembly at which the abstract was presented listing only Dr. Miller as the author.

Dr. Kaplan claims in her brief that there is no meaningful distinction between "technical" and "non-technical" portfolios, but she does not support this contention with any evidence. She contends that she directed over $70 million worth of programs from 2011 to 2015,  and that she volunteered to direct more portfolios but was denied the opportunity. She offers her AFRL Form 280 from 2009 through 2011 as support for the former contention, but offers no support for the latter.  Plaintiff also disagrees with defendant's contention that Dr. Kaplan did not perform the duties of acting director while the position was vacant. As support, she points out her SDE, which states that she "[l]ed and managed RSE Physics & Electronics Portfolio basic research technology area for entire AF ($120M annual budget) for 30% of cycle." *Id.* at 265.

Plaintiff further argues that she did perform her own research, in the form of two publications, which she has supported by pointing to her resume and her AFRL Form 280 from October 2011 through September 2012. *Id.* at 265. (providing that Dr. Kaplan "[a]uthored accepted abstract" and "[a]uthored published abstract, Basic Research Challenges in Space Observation"). We agree that this evidence suggests that she did perform her own research, even in light of defendant's contention that Dr. Miller had a role in the one of the

publications.

### B. Dr. Blackwood

Dr. Blackwood's SDE indicates that his job title was a program officer in the AFOSR chief scientist's office. It places him in the "program manager" job category. Using his SDE as support, defendant argues that Dr. Blackwood is not a proper comparator because, during the relevant assessment period, in addition to his program officer duties, he performed "all activities assigned to AFOSR chief scientist as directed by the AFOSR Director, while the position was unfilled" and implemented and coordinated the process for the AFOSR's annual spring review, during which ASOFR program officers present their work. *Id.* at 203. While plaintiff challenges this assertion, she offers no contrary evidence.

Plaintiff also challenges defendant's reliance on Dr. Blackwood's SDE. She contends that the Broad Agency Announcement ("BAA") contains a more accurate statement of an employee's job title. In the BAA, Dr. Blackwood is listed as "Deputy for Technology Transition." *Id.* at 133. Defendant's response to this argument is that job titles are irrelevant; rather, duties are the controlling factor in determining whether someone is a proper comparator.

### C. Dr. DeLong

Dr. DeLong was the deputy director of the RSL directorate from 2010 through February 2011. He was appointed chief of his directorate in February 2011, and thus placed in the "supervisor/manager" job category. Defendant uses Dr. DeLong's resume and 2009-10 AFRL Form 280 to show that he performed the following duties in addition to being chief of his directorate: acted as the RSL director while that position was vacant, managed a technical portfolio within his directorate, conducted his own research, and performed supervisory duties.

Plaintiff disputes the characterization as "supervisor/manager," claiming that Dr. DeLong did not become chief of his directorate in 2011 because the prior chief  a female  was improperly removed (i.e. that he did not become chief because the position was not actually vacant). Plaintiff has not presented any evidence of this however; she has merely alleged it in her response. On the other hand, defendant has presented Dr. DeLong's AFRL Form 280 from 2011 through 2013, which reflects that Dr. DeLong did serve

as chief of his directorate. Plaintiff also disputes that Dr. DeLong performed his own research by arguing that the publications listed on Dr. DeLong's resume are not actually his own, but she has provided no evidence supporting that proposition.

### D. Dr. Luginsland

The directorate's organizational chart reflects that, while Dr. Kaplan was the deputy director of the RSE directorate, Dr. Luginsland was a program officer in that same directorate. His SDE indicates that Dr. Luginsland's job as a program officer was to manage technical portfolios.

Pointing to Dr. Luginsland's AFRL Form 280 for 2012-14, plaintiff claims that Dr. Luginsland was actually the Program Element Monitor, which she contends is similar to her deputy position. She also argues, without support, that Dr. Luginsland did not manage a technical portfolio while he was in this position.

**Claim of Unequal Pay While Program Officer**

From February 2013 through the present, Dr. Kaplan has been a program officer in the RTC division. She has identified a second set of male comparators for this position: Dr. Robert Bonneau, Dr. Arje Nachman, and Dr. Kent Miller. Once again, defendant challenges their use as comparators.

Defendant agrees that Dr. Kaplan's program officer comparators Dr. Bonneau, Dr. Miller, and Dr. Nachman were assigned to the same job category as Dr. Kaplan, "program manager," but argues that job categories alone do not establish equality of work. Instead, it offers proof of the comparators' particularized duties, which it argues reflect a greater level of skill and effort than that required of her position.

Listed below are Dr. Kaplan's and her asserted program officer comparators' contribution scores during the relevant assessment periods, as well as the resulting salary each employee was paid during the year following the relevant assessment period.

|  | OCS 10/2012-9/2013 & 2014 Salary | OCS 10/2013-9/2014 & 2015 Salary |
|---|---|---|
| **Dr. Kaplan** | [ ]<br>[ ] | [ ]<br>[ ] |
| **Dr. Bonneau** | [ ]<br>[ ] | Not program officer |
| **Dr. Miller** | [ ]<br>[ ] | [ ]<br>[ ] |
| **Dr. Nachman** | [ ]<br>[ ] | [ ]<br>[ ] |

All three comparators had the job title "program officer" for at least part of the period from October 2012 through the present, but defendant and plaintiff disagree as to the specific roles and job duties that each employee had.

Dr. Kaplan and her comparators obtained a Ph.D. and post-graduate experience in specific fields: Dr. Kaplan in computer science, Dr. Bonneau in electrical engineering, Dr. Miller in physics and space science, and Dr. Nachman in applied mathematics. Defendant offers the AFOSR's BAA as proof that each program officer comparator has managed more portfolios than Dr. Kaplan and a document referred to as the AFKAP034266[5] to show that the comparators managed larger budgets. These documents suggest that Dr. Kaplan has managed only one technical portfolio since 2010, while her male comparators have managed multiple portfolios. Defendant points out that Dr. Kaplan has been a program officer for two-and-a-half years, while Drs. Bonneau, Miller, and Nachman have been program officers for six, thirteen,

---

[5] The document purports to provide the 2013, 2014, and 2015 budgets of Dr. Kaplan and her program officer comparators, showing that Dr. Kaplan's budgeted amount was the lowest each year. Plaintiff has not attempted to dispute the contents of the document, but defendant has not provided any explanation for the source of this document or why it should be assigned weight.

and fifteen years, respectively, but does not explain how longevity factors into higher pay.

Plaintiff asserts that she managed more programs and handled more funding than all of her program officer comparators combined. She refers to her AFRL Form 280 for October 2009 through September 2011 to show that she managed over $70 million worth of programs from 2005 through 2011 and that she managed the $265 million National Defense Science and Engineering Graduate Fellowship program. Plaintiff also disagrees that all of her male comparators were subject-matter experts with respect to all the portfolios they managed. Specifically, plaintiff claims that Dr. Bonneau's background was in electrical engineering but he was given both the Complex Networks and Systems and Software Portfolios instead of Dr. Kaplan, who is a computer scientist.

We examine below the parties' respective assertions in light of the applicable law.

## DISCUSSION

The Equal Pay Act provides that

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

In order for plaintiff to establish a prima facie violation, therefore, she must show that the AFOSR discriminated on the basis of sex by paying lower wages to her than to employees of the opposite sex for a job which requires "equal skill, effort, and responsibility" and is "performed under similar working conditions." *Id.* Whether two jobs require equal skill "includes consideration of such factors as experience, training, education, and ability," which "must be measured in terms of the performance requirements of the job." 29 C.F.R. § 1620.15(a) (2015). "Effort is concerned with the measurement of the physical or mental exertion needed for the performance of a job," while responsibility involves the "degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." *Id.* §§ 1620.16(a), 1620.17(a).

If plaintiff establishes a prima facie case, the burden shifts to the defendant to show that the pay differential is justified under one of the four exceptions provided by the Act. *Yant v. United States*, 588 F.3d 1369, 1371 (Fed. Cir. 2009).

In its motion, defendant has made a number of arguments which can be briefly summarized as follows:

1.  Any claim that the ASOFR violated the EPA before January 27, 2011 is time-barred;

2.  The EPA does not apply to plaintiff's allegations because they are grounded in retaliation rather than gender discrimination;

3.  Plaintiff cannot establish a prima facie violation of the EPA;

4.  If the court finds that plaintiff has established a prima facie violation of the EPA, plaintiff's claim still fails because the Lab Demo is a merit system; and

5.  Plaintiff has the burden of showing that the EPA violation was willful, but has failed to make such a showing.

Plaintiff has also cross-moved for summary judgment, but only as to the year 2015. Plaintiff contends that she grieved her OCS for the assessment period October 2013 through September 2014 through the formal grievance process, requesting equal pay to other DR-IV program officers for 2015, and was denied. According to plaintiff, this denial of pay equal to other DR-IV program officers for the year 2015 is a clear violation of the EPA.

### Are some of plaintiff's claims time-barred?

Defendant is correct that the relevant time period in this case extends only as far back as January 27, 2011, because a claim filed under the Act, in the case of a willful violation, must be filed within three years from the time it first accrues. 29 U.S.C. § 255(a). Dr. Kaplan's claim was filed on January 27, 2014, so the relevant period extends only as far back as January 27, 2011. However, because Dr. Kaplan's salary for the year 2011 was determined during the assessment period October 2009 through September 2010, this assessment period is necessarily relevant when determining whether Dr. Kaplan was denied equal pay during the year 2011. Accordingly, we will not consider any claims of an EPA violation prior to January 27, 2011, but we will consider plaintiff's October 2009 through September 2010 assessment when determining whether she was denied equal pay in 2011.

### Does plaintiff's allegation of retaliation bar her EPA claim?

According to defendant, for an EPA violation to have taken place, the pay disparities must be based "solely on gender." *Yant*, 588 F.3d at 1373. Defendant claims that Dr. Kaplan has failed to allege that the pay disparities were based on gender; rather, it argues that plaintiff's real claim is that the pay disparities were based on retaliation, which does not constitute an EPA claim. Even if Dr. Kaplan does show that the pay disparities were based on gender, defendant argues, because she also contends that they were based on retaliation, they are not based "solely on gender," and therefore the EPA claim fails. We disagree. Plaintiff has alleged that she was paid less than her male comparators for substantially equal work because of her gender. All that is required of plaintiff is "a showing that discrimination based on sex exists or at one time existed." *Id.* It is sufficient, then, if the employer has paid lower wages to her than to employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The inquiry stands on its own, irrespective of other possible motivations,

14

particularly when those alleged motivations ultimately relate, allegedly, to retaliation for plaintiff's complaints about gender discrimination.

### Whether plaintiff can establish a prima facie EPA violation

Having considered defendant's preliminary arguments, we move to the merits of plaintiff's claim. Only if she makes a prima face case is it necessary to move to the government's other defenses.

A "bird's eye" comparison based on the same general duties cannot establish equal work. *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333 (4th Cir. 2004). Thus, job titles or job classifications, while relevant, are not necessarily determinative. The controlling factor in determining whether work is substantially equal for purposes of an EPA claim is the actual job duties of plaintiff and her comparators. *See Santiago v. United States*, 107 Fed. Cl. 154, 161 (2012). AFRL Manual 36-104 defines all the job categories to which plaintiff and her male comparators are assigned, and provides that the job categories "are determined based upon the duties that comprise the majority of the position's work." Def.'s App. 62. We therefore begin, but do not end, with job titles and classifications.

<u>Deputy Director Claim</u>

Plaintiff's principal arguments in opposition to defendant's motion are as follows: (1) Dr. Blackwood's job title, as stated on the BAA, is "Deputy Director for Technology Transition," and thus, like plaintiff, he is a deputy director and therefore a legitimate comparator; (2) Dr. Kaplan, like her alleged comparators, conducted her own research and managed technical portfolios; (3) Dr. Kaplan performed the duties of the RSE director while the position was vacant; (4) Dr. Luginsland was actually "Program Element Monitor," which is similar to a deputy position; and (5) Dr. DeLong was not a "supervisor/manager."

We found earlier that plaintiff offers no meaningful support for her contention that Dr. DeLong was improperly characterized as a "supervisor/manager." In any event, as we stated earlier, job duties not titles are the controlling factor. *Santiago*, 107 Fed. Cl. at 161.

Dr. Kaplan and her male comparators' SDEs place them in different job categories. Dr. Blackwood's SDE states that his job title is program officer in

15

the AFOSR chief scientist's office. This places him in the program manager job category. Dr. Luginsland's SDE also places him in this job category, and provides that his title is program manager in the RSE directorate. According to AFRL Manual 36-104, a program manager is

> [a]n individual who plans, advocates, coordinates, and evaluates the developmental activities for a system, subsystem, or component to meet cost, schedule, performance and supportability criteria as determined by higher authority; and assures surveillance of critical technical program issues through coordination of a variety of functional discipline and organizational elements. This individual has authority to allocate agency resources to accomplish projects within set milestones.

*Id.* at 62-63.

Dr. DeLong was deputy director of the RSL directorate from 2010 through February 2011 and chief of the RSL directorate starting in February 2011. The job category to which he was assigned during the relevant time period is "supervisor/manager," which according to AFRL Manual 36-104 is

> [a]n individual who has been delegated authority in the interest of the agency to hire, direct, assign, promote, reward, transfer, furlough, layoff, recall, suspend, discipline, or remove employees, adjust grievance, or effectively recommend such actions, if the exercise is not purely routine or clerical in nature but requires the consistent exercise of independent judgment. Work is accomplished through combined technical and administrative direction of others and constitutes a major duty occupying at least 25 percent of the time. An individual who has full authority to direct the work of an organizational segment; accountability for the success of specific line or staff functions; monitors and evaluates the progress of the organization toward meeting goals; and makes adjustments in objectives, work plans, schedules, and commitment of resources.

*Id.*

Dr. Kaplan's SDE places her in the job category "Plans & Programs S&E." AFRL Manual 36-104 describes someone in this job category as "[a]n

individual who formulates and recommends plans and policies to enable the effective accomplishment of the organizational mission, and studies mission areas, exploratory technologies, and current developmental and operational programs to plan new efforts or establish new performance goals." *Id.*

At first glance, the placement of Dr. Kaplan and her alleged deputy director comparators in different job categories, which are given different descriptions in AFRL Manual 36-104, suggests different job duties. However, the descriptions of these job categories simply do not provide us with enough information to state with certainty that the jobs of Dr. Kaplan and her alleged comparators did not require "substantially equal" work. Moreover, the information we have been given about additional duties held by Dr. Kaplan and her male comparators is equally insufficient and, to an extent, disputed.

Specifically, plaintiff has directed us to her AFRL Form 280 to show that she conducted her own research, performed the duties of the director while the position was vacant, and directed over $70 million worth of programs from 2011 to 2015. Defendant, on the other hand, proffered evidence showing that Dr. Kaplan's alleged program officer comparators also performed their own research and managed technical portfolios. In addition, defendant showed that Dr. Blackwood performed some of the duties of the chief scientist while that position was unfilled. Thus, even though their job category descriptions are different, Dr. Kaplan and her male comparators do appear to hold some of the same or similar duties. The fact that we are presented with some similar job duties and some different job duties does not, however, give us enough information to determine whether, as a matter of law, the jobs of Dr. Kaplan and her alleged comparators require the same level of skill, effort, and responsibility. We therefore deny summary judgment as to plaintiff's deputy director claim.

Program Officer Claim

Dr. Kaplan and her program officer comparators, Dr. Bonneau, Dr. Miller, and Dr. Nachman, are in the same job category, "program manager." This means that while the description of the "program manager" category listed in AFRL Manual 36-104, shown above, can be used to help show that each program officer has the same general duties, it does not, on its own, suffice to show that each program officer performed equal work. *See Wheatley*, 390 F.3d at 333. We must examine the skill, effort and responsibility required by each job.

17

We look first to the skill required by each job. Whether two jobs require equal skill "includes consideration of such factors as experience, training, education, and ability," which "must be measured in terms of the performance requirements of the job." 29 C.F.R. § 1620.15(a). The relevant inquiry is whether the "amount or degree of skill required to perform one job is substantially greater than that required to perform another job. . . ." *Id.* Defendant argues that Dr. Kaplan's interrogatory responses, which stated that the jobs require equal skill because the Lab Demo system does not use "skill codes" to describe job duties and because the primary duties of her and her comparators are the same, failed to relate any of these factors to the performance of her and her comparators' jobs. Def.'s App. 56-57. We agree that these responses are insufficient to establish equal work because they do no more than reiterate that Dr. Kaplan and her comparators have the same general job duties, which is insufficient to establish equal work. We are mindful, however, that plaintiff appears pro se and give her some latitude in presenting her argument.

Defendant further contends that all of the program officers' jobs require expertise in their respective fields and participation in their respective scientific communities. Put another way, their jobs cannot be compared because they have specialized skill and expertise in the fields that relate to their jobs. To back up this contention, defendant has provided the following: (1) excerpts from the AFOSR 2014 Technical Strategic Plan, which provides that program officers are "required to be intimately familiar with advances in their technical subjects;" (2) an email written by Dr. Patrick Carrick, the AFOSR Director, stating that "we generally hire people with very specific scientific/technical expertise;" and (3) a presentation presented by the agency regarding the role of program officers which provides that program officers are "recognized experts in their respective fields." Def.'s App. 112, 117, 186.

We agree that the fact that each individual is a "program manager" does not automatically establish equal work. *See Wheatley*, 390 F.3d at 333. The evidence presented by defendant does show that each program officer has unique expertise which relates to his or her technical subject. However, the requirement of technical expertise, on its own, does not lead to the conclusion that plaintiff and her alleged program officer comparators' jobs did not require the same "amount or degree" of skill. Defendant supports its factual argument but gives us no basis for applying it.

The next factor is effort, which is "concerned with the measurement of

18

the physical or mental exertion needed for the performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered in determining the effort required by the job." 29 C.F.R. § 1620.16(a).

Defendant argues that Dr. Kaplan's job does not require the same effort as those of her comparators because Dr. Kaplan's male comparators' jobs involve managing more portfolios and larger budgets. Defendant points to the BAAs, which list Dr. Kaplan's male comparators as managing a number of portfolios from 2010 through 2015, and the AFKAP034266, which purports to list the budgets of Dr. Kaplan and her male comparators from 2013 through 2015. Def.'s App. 118-69.

Defendant is correct that the BAAs have listed Dr. Kaplan's comparators as managing more portfolios from 2010 through 2015, but it has failed to explain why this necessarily leads to the result that their jobs required more effort. This strikes us as a judgment made after weighing nuanced evidence. While raw numbers are no doubt relevant, we are unwilling to draw the inference that the work of Dr. Kaplan's program officer comparators required more effort. As to the budgets, we have not been given any basis for determining who compiled AFKAP034266 or why it is controlling.

Neither party has argued the question of responsibility, and thus we assume that the relative responsibility involved in Dr. Kaplan's and her male comparators' jobs is not in dispute.

Making a judgment that two positions do not involve application of equal skill, effort, and responsibility strikes as presumptively a matter involving some judgment and for positions such as those at bar, application of nuanced evidence. While we are prepared to entertain the possibility that summary judgment could be appropriate, finding a complete absence of relevant disputed facts demands more than the isolated, and in any event partially disputed, assertions of fact offered by defendant. We are unwilling, particularly in view of plaintiff's pro se status, to draw the more complex judgments called for by the EPA. In sum, defendant has not established that, as a matter of law, the jobs of Dr. Kaplan and her male comparators do not require equal skill, effort and responsibility. Consequently, we also deny summary judgment for defendant as to plaintiff's EPA claim while she was a

program officer.[6]

The last two of defendant's arguments that plaintiff cannot rebut defendant's merit system defense and that plaintiff cannot establish that the EPA violation was willful  are likewise not conducive to summary judgment, at least as presented here.  As to the first, while we are indeed impressed by the seeming complexity and objectivity of the rating system created by AFSOR, it is apparent as well that there are decision points which appear to be open to purely subjective assessment.  Perhaps that is inevitable in any rating system, but we are reluctant to rule for defendant on summary judgment without some better explanation as to how the various steps in the process limit subjectivity and ensure uniformity.

Willfulness requires that the defendant, at the time of the prohibited conduct, either knew that its conduct was prohibited, or showed reckless disregard as to the illegality of its conduct. *Adams v. United States*, 350 F.3d 1216, 1229 (Fed. Cir. 2003). According to defendant, plaintiff has indicated that she can show willfulness in three ways: (1) cross-examination of witnesses who will testify that the pay setting was "willful"; (2) the administrative grievances that Dr. Kaplan filed through the Lab Demo's grievance process; and (3) post-complaint communications that plaintiff sent to the AFOSR regarding the alleged EPA violation. Defendant disagrees that any of these can show wilfulness.

Defendant is likely correct that post-conduct grievances and communications between Dr. Kaplan and the AFOSR may not suffice to show that, at the time of its allegedly illegal actions, the AFOSR knew that its conduct was prohibited. However, plaintiff has identified nine people from whom she can believes she can elicit testimony showing that the AFOSR wilfully violated the EPA. In light of plaintiff's pro se status and the fact that trial on plaintiff's prima facie case is in any event necessary, we are unwilling to foreclose the opportunity for further exploration of the facts on the issue of wilfulness.

---

[6] In addition, we deny plaintiff's cross-motion as to the year 2015 because we do not have sufficient information to determine that Dr. Kaplan and her male comparators' jobs *do* require the same level of skill and effort.

CONCLUSION

For the reasons stated above, we deny both party's motions for summary judgment. The parties are directed to consult and propose a trial schedule by April 15, 2016.

_____
ERIC G. BRUGGINK
Judge